Mr. Belton, may I remove my mask? Oh yes. Please proceed. Your Honors, and may it please the Court, my name is Will Hack and I represent the appellant student J.P. We request that you reverse or remand the lower court's decision which would take J.P. out of his current school and send him to the segregated state school for the severely disabled. Your Honors, this is a case about the IDEA's least restrictive environment mandate. It is not about FAPE, or the Free and Appropriate Public Education. Both parties agree that J.P.'s IEP provides him a FAPE, and it's not about the IEP itself. It would help if you talked a little more slowly. Yes, Your Honor. And this case is not about the IEP itself. Both parties agree with the contents of the IEP, including J.P.'s education and services. The only disagreement is where J.P. should go to school. The district wants to move him to the state schools for the severely disabled, and J.P.'s mother has rejected that change. Now when you say this is not concerned with FAPE, that of course is a critical issue. At least in terms of the district court's reasoning. You can't just say that. Your Honor, I believe that the district court is applying the FAPE standard incorrectly to the least restrictive environment mandate. Okay, but you started out by saying this is not a FAPE case. I would just maybe clarify that a little bit by saying that of course his education is at stake, but the standards that we use to evaluate the least restrictive environment mandate are different from the standards that we use for the free and public education. As pointed out by the Third Circuit in Oberti, when IDEA's mainstreaming requirement is specifically at issue, as in this case, it's appropriate to place the burden of proving compliance with IDEA on the school. So indeed the act's strong presumption in favor of mainstreaming would be turned on its head if parents had to prove that their child was worthy of being included, rather than the school district having to justify a decision to exclude the child. That's directly from Oberti. You're talking so fast. Remember your listeners. My colleagues can keep up with it, but I can't. Apologies, Your Honor. I'll try and speak a little more slowly. It's a key to effectiveness. Well, with this case, what we look at is Paul v. Segrin in the Eighth Circuit, Paul P-A-C-H-L. The threshold issue under Paul is whether the proposed placement is superior to the current placement. IDEA creates a preference for mainstream education, and disabled students should be separated from her peers only if the services that make segregated placement superior cannot be feasibly provided in a non-segregated setting. And again, this is in compliance with agreement with Ronker. The question that this case raises for me, broadly, is has there been a case that considered this issue when the child wasn't being mainstreamed in either location? And the evidence suggests cannot be. Well, Your Honor, I think that the district court's finding that he isn't educated in a mainstream setting... You're not answering the question. Is there a case that's involved where a child that was not being mainstreamed at the school that is at issue and is being sent somewhere else to a non-mainstream school? Well, for example, Your Honor, in... How can the courts even provide a remedy for that if there's not mainstreaming anywhere? Well, Your Honor, he does have access to mainstreaming. Answer my question. Is there a case involving that? Yes. Daniel R.R. from the Fifth Circuit is a case that talks about how even if a student can't be educated in regular education... Now, but I talk about a case that involved a student who was not mainstreamed at the school, the transferor school, and wanted to remain there and not be sent to a transferee school that would not mainstream him or her. Your Honor, I think maybe I disagree that he's not receiving any mainstreaming at his current school. He does interact with students that have regular education and that don't have disabilities in the hallways at recess coming and going. Educationally, he's not mainstreamed. But he is receiving a benefit from that educationally. All right. You still haven't answered the question. I take it the answer is no, there is no such case. Your Honor, I'm not aware of this precise issue that you're talking about. But Daniel R.R. does speak to the issue. All right. So this case is a first impression nationally. Your Honor, well, in regards to the IDEA, this isn't a new concept. The continuum of services includes a placement at a regular school, but separate, segregated, at that regular school, which is the placement that J.P. is in now. So I don't think this is an issue of first impression. But I am not aware of a case where, again, as alleged by the district court here, he's totally segregated. Because I simply don't believe that that's the case. You're not seeking a remedy at Trail West, correct? That's right, Your Honor. We're asking that he remain at his— So you're asking that he be allowed to stay non-mainstreamed at Trail West? And continue to experience mainstreaming by seeing students that don't have disabilities in the regular education environment at the school district. Which, again, is an important part of an individual's education. And, again— Is that the only benefit from the mainstreaming that you're identifying? Is the visual contact sort of passing in the hallways? Well, and also his experience at recess as well. There are numerous times throughout the day that he watches and observes and models the behavior of other students. When you say numerous times, can you describe that? Because it does seem that he is in a separate room for his educational progress. That's correct, Your Honor. He's in a separate room throughout the day. But he has experience with students that don't have disabilities when he comes and goes through the halls. And that's protected, again, as they talk about in Daniel R.R. That's a specific situation that's different under the continuum. A segregated placement at a school that's a regular education school. And it's important because J.P. is able to model behaviors off of the students that he sees that don't have disabilities. But didn't the district's experts suggest that being in a setting with 400 kids was leading to distractions and that actually undermining his ability to meet his IEP? Well, Your Honor, they specifically talk about the potential distractions of being in this current placement, which is a classroom with students that have... Potential? Or experienced? Well, Your Honor, I think in comparison to the distractions he would experience at the state school for the severely disabled, there isn't really a difference. And it's potentially he would be much more distracted in a situation where he's being educated alongside students that have severe disabilities. The people who have met this third Paul Versegren factor... Is there any record that he would be more distracted by other disabled students? Your Honor, that's not part of the district court's finding. No. But the district court doesn't make specific findings that he would be less distracted in this school district. It seems to assume that. It seems to... And I don't know if the district court is making a factual error. But it seems to be saying that, you know, if we send him to this segregated school, he'll have his own teacher. He'll have his own classroom. He won't be distracted as much. Whereas the real situation is he'll be placed in this classroom with exclusively students with severe disabilities. And that's a situation that's likely to be more distracting than his current placement with mild to moderate disabilities. If I could follow up again on the benefits that you're asserting that JP would get from the mainstreaming at Kennedy Trail. You've talked about visual contact with other students in the hallways and at recess. A couple of questions. Any other locations or any time periods during the day that that visual contact happens? And two, is there any other benefit that you're asserting that JP would get from staying at Kennedy Trail? Your Honor, certainly when he comes and goes at the school, that's a major point in time when he arrives and leaves outside of the school. It's a major time that he watches other students that don't have disabilities and learns from them. But keep in mind this is a student who has an IQ in the range of zero years old to six months old. So for him, the interactions that we talk about, looking into the eyes of another student and smiling, that's appropriate for someone between zero years and six months of age. And again, the modeling that he would learn from that kind of behavior, which is talked about in Daniel R.R. and other cases, the kind of learning that he experiences doesn't have to be similar to that of other students' education in a regular education environment. And then was there anything other than the visual contact that you described and the benefits you would receive from that? Well, Your Honor, I would speak specifically to this first Paul Versegren factor, a benefit of at his regular education setting, he learned how to walk. And this is discussed by the district court as if it were a de minimis achievement. But for a child with an intellect between zero years old and six months old, this is a major achievement. I thought the discussion by the court was that it was physical. The court does seem to say that for some reason, if because of this... It seems to say it's said. Yes, Your Honor. And you're saying, what, you're disregarding the analysis or... I just don't think that that's the appropriate legal analysis because LRE looks at where... What case supports that that's inappropriate for appellate review purposes. So the question there, Paul Versegren, is, is he able to receive a benefit in his mainstream setting? And he is. He learned how to walk. It's in his IEP. There's no kind of question... That was a 30% mainstreaming issue, right? Non-mainstreaming. Where he had been non-mainstream through grade school, as I recall. And in middle school or junior high, they proposed a non-mainstreaming 30% of the time, and that was the issue. Now, that can't be more factually different from this case than I can imagine. Well, the IDEA places a spectrum. It's called the continuum upon which a person is educated. What section of the statute? This is the IDEA... Where's the word continuum in the statute? This is at 34 CFR 300.115. The continuum requirement... At least I knew the regulation wasn't the statute. Apologies, Your Honor. 34 CFR 300.115 says the continuum requirement must include the definition of special education, instruction in regular classes, special classes, special schools. So special schools is a more segregated placement than a special class. And that's exactly the situation here. They're proposing to move him to a more segregated placement where he won't have access to any students that don't have disabilities. He will essentially be 100% segregated. What about the benefit that he would receive at Trail West? That's correct, Your Honor. With the second Paul Versegren factor, it talks about that if he is to be moved, the benefits for mainstreaming must not be far outweighed by the benefits gained from services which could not feasibly be provided at Belton. And so really the only difference in terms of what educational benefit they can provide that they speak to is a trained teacher. They say that the teachers at Trails West... Trails West is able to employ teachers who are trained and credentialed specifically to instruct profoundly disabled students. But there's nothing in the record that suggests that he could not have such a teacher at his current school. That his current... Well, there is, isn't there? I mean, Jessica Hoots testified that that sort of special certification is extremely rare and that in, quote, in her 20-year career, she's never been able to hire a teacher who had one. Your Honor, she suggests that she never has hired someone with such a credential. Because it's extremely rare. But it's not that specific credential that JP is asking for or that we believe necessarily exists at Trails West. We just require some kind of training for educating students with severe or profound disabilities. And one of the possibilities of the IDA... I mean, you're saying you don't require a certification, but you require the training which would lead to the certification. So Your Honor, what she's talking about is a specialized degree, which I don't think is necessary to train and educate someone with a severe disability. For example, you could bring in an itinerant teacher who could provide direct instruction to JP. That's one of the potential supports and services. Well, I mean, JP had one-on-one instruction, correct? And the suggestion was this would be a more highly trained instructor that needs to be brought in? Or somebody that could be trained at the district. There's just no reason to believe that that couldn't happen in his regular education school district and only could happen at Trails West. There's nothing about the cost. There hasn't been any kind of this ronker idea that, well, if it's prohibitively expensive, then we have to consider that. There's none of that alleged here. I see that my time is running out. But you're not challenging the IEP for JP, correct? That's right. There's no challenge. So as it stands right now, what you're saying is he doesn't need any additional services or a different type of teacher. And we do believe that his current education is providing him with the necessary education. The school district is saying, oh, he can get a better education at the segregated school because of this specific issue, that they have someone who's specially trained, which they haven't looked at. And I see I'm running out of time. But JP would be, and his mother would be, satisfied with remaining at Kentucky Trail under the current IEP and the current set of teachers and arrangements for the location of education. That's right. And she's very satisfied with the progress he's made in terms of walking and beyond that. Thank you. I reserve the remainder of my time. Thank you, Your Honor. May it please the Court. Thank you. Picking up on a few things that the Court has already addressed this morning. Some of the arguments in the administrative record... Speak up a little. Sorry. Some of the arguments made by the plaintiff here are divorced from the administrative record. There are a good number of arguments and assertions that the district could have done things that were not litigated at the lower court level, at the administrative hearing level. Primarily, there's no evidence in the record that supports the idea that JP would be more distracted at Trails West, or that he benefits from peer modeling, or that he benefits from socialization. This is most analogous, I think, to the AW case, where the district court found that the student did not benefit from mainstreaming at all. That was also a transfer to state school case in which this court... Is that cited in your brief? It is. And it is the case where this court, I think, first adopted the Ronker analysis by reference. Your Honors, mainstreaming as a concept does not outweigh a student's individualized data or the need to provide that student with a FAPE. The district court in the AHC found that JP was only making de minimis progress at best, and we know from Andrew F. that de minimis is not sufficient. The administrative hearing focused on FAPE because that's the evidence that was presented by the plaintiff. We were presented with an argument that the student was making such dramatic progress that no change in location was necessary, that it was inappropriate for him to move from his self-contained classroom at Kentucky Trail to Trails West. Andrew F. fully informed... Is he still at Trails West? I'm sorry, Kentucky Trail? It's not in the record, but he has matriculated because of his age. He's now in an age-appropriate classroom. Was there a stay pending appeal? There was a stay pending appeal, but there was agreement amongst the parties that he would move according to his age. The Andrew F.'s FAPE standard must inform any decision with regard to a student, and that is holistic. Let's talk about mootness a moment, if he's matriculated. Why not? Why is it not moot? I don't believe that we've advanced the idea of mootness because he has... I'm advancing it. It's Article 3 jurisdiction. I don't believe it's moot because the district still wants to move him to Trails West, which is the Missouri School for the Severely Disabled, instead of educating him within a school district special education classroom. In other words, on the continuum... He's matriculated from what level? He was in an elementary school classroom. He's now in a middle school classroom. The least restrictive environment mandate itself anticipates that FAPE is relevant to the determination. It says that mainstreaming is appropriate to the maximum extent appropriate, and it says that the student must be removed from regular classes where the education cannot be provided satisfactorily. I believe Andrew F., and Andrew F. is still evolving, but Andrew F. has to play into a determination of what appropriate means and what satisfactorily means. IEP teams cannot be satisfied with the tick beyond de minimis progress that JP has shown in the 18 months that the school district collected data. IEP teams have to set their sights higher. They have to be appropriately ambitious in the drafting of an IEP, and I believe that means necessarily looking at least restrictive environment considerations and doing a more critical analysis of the adverse impacts an environment may have. Can you help me understand the record on the advantages of the lesser restrictive environment at Kentucky Trail in terms of the interaction with the non-disabled students? What is in the record that... You suggested at the start of your argument that there's nothing, but is there anything about the benefit that JP receives, gets from that, even if it's minimal interaction with the other students? I believe all of the district witnesses testified that he has virtually no interaction. He is in the same building, and I cannot tell you... That's not the entire record, is it? I'm sorry, I don't... Judge Kelly asked, is there anything in the record, and you said all my witnesses testified the way I'm arguing. Right. Well, that's not answering the question. I was starting there. I was going to then move to the plaintiff's witnesses. The plaintiff presented their expert who didn't know JP, didn't know Kentucky Trail, and so he was unable to opine on any benefits or any interactions. The other witnesses that were presented by plaintiff were outside service providers who were not familiar with JP's experience within the school district. I don't think it's an unfair characterization by the district court to say that he has virtually no interaction with his peers at Kentucky Trail. I assume the mother testified. She did. Did she not address the subject at all? I do not recall her testifying that he has meaningful interactions at all with his peers at school. Well, no. The question was benefits. What benefits did she testify that he was receiving that she wanted him to continue to receive? I don't recall her testifying to that particular point. I know the plaintiff has argued in the briefing that he benefits from his peers. We do know from the record that he started at Kentucky Trail in a more immersed... He had more exposure with his peers when he first started. That was reduced after he displayed some behaviors. He would drop to the floor, put his hands over his ears. He would vomit from agitation. And gradually, his exposure to his peers at Kentucky Trail was reduced and eventually it was virtually none. What about his interaction and exposure with peers in his separate classroom? I'm assuming that those students are perhaps less severely disabled than the ones at Trails West. Is there any evidence that there's a benefit that J.P. gets from that interaction that he would not get at Trails West? There was no evidence on that. There was no testimony by an expert that came in and said, these are the benefits that J.P. receives by his current placement at Kentucky Trail, including interaction with his disabled peers in the special education classroom. As the district court found, there are approximately 12 other students in the special education classroom. Not all of them are there all of the time. They move in and out. But he is, right? Right now. But he is. I believe he does, I think on maybe twice or three times a week, he does leave the classroom for a therapy session. But that is a one-on-one, where he's even more isolated than he is within the special education classroom. And he goes to recess with the rest of the kids? I don't recall him going to recess with the rest of the kids. It is a voluminous record. I don't recall that being testified to. I believe that he is essentially one-on-one by himself during the day within the bigger school district. But he is essentially an island unto himself within Kentucky Trail. It's important to recognize, as you, I think, pointed out earlier, Judge Kelly, that there is no dispute about the sufficiency of this IEP. There was never a suggestion by Ms. Ogden, her advocates, her attorneys, that the school district should add any more supplemental aids or services to his IEP. That's a critical issue in this case. Well, except a better trained special teacher. That came up in the briefing at district court. That is correct. Did that testimony address the qualifications of the teacher? Mrs. Hart, his teacher, testified tearfully at times about her frustration in trying to educate JP. Mrs. Hart was a runner-up for the Missouri Teacher of the Year the same year that JP was in her class. But the question is, basically, was the issue raised in an evidentiary way? There was no testimony by an expert that she was... So the first time that issue surfaced was in post-hearing briefing? The first, yes. Yes. It was the first time. They latched on to her discussion of her frustration about her inability to meet his needs. And they construed that as some admission that she was incapable or that she needed some other qualification to teach him. It's simply not true. She's an incredibly competent and capable teacher, and that's why he's in her classroom in the first place. Her classroom is the most restricted classroom in the elementary system at the school district, and he is the most restricted student in that classroom. So his current IEP... Where would we go on the record for that? I'm sorry? Well, you just made a fact assertion. Where is that in the record? I believe it's in the district court's... The order from the district court, and it's throughout the record. I'm happy to provide you with the citations. I don't know that's... He is the most restricted student in the most restricted classroom in the district. Yes. Yes. I believe that... Okay. Who testified to that? Mrs. Hoots testified to that. I believe Mrs. Hart testified to that. So again, we are faced with the argument at the administrative level that JP was doing so well that he should not move to Trails West. And then we were subsequently... The argument was if the school district wants to move him, it's only because they're not doing the right things. So the idea that we should have trained the teacher better, but we do know that the supplementary aids and services that are set out in the IEP are agreed to. There is no dispute that the IEP, in every other way, shape, and form, is appropriate. The primary evidence presented by the plaintiff at the administrative hearing was that of his outside service providers. These were his doctors and therapists. That was to supplement this argument that he was making progress. The administrative hearing commission and the district court gave this testimony no weight because these were not members of the IEP team. These were folks who never attended an IEP team meeting, and in fact, Ms. Ogden refused to allow the district to consult with these service providers. The IEP team requested specifically to consult with his therapists and his doctors, and she refused to provide consent. This is classic Monday morning quarterbacking that this court has held that is inappropriate under Gill. What's our standard of review? Standard of review is clear error, as long as there is not a mistake in the law. Clear error by? The district court. Well, that suggests that the district court was doing de novo review of findings in the administrative process. I know this is a complex question. Under the IDA, it's far more complex than it ought to be. The district court's review of the administrative hearing commission is a modified de novo review where the district court judge is charged with making independent determinations of the provision of FAPE and least restrictive environment procedural compliance along with a degree of deference to the administrative law judge who had an opportunity to view the witnesses and view the evidence firsthand. It is, as you said, a complex issue, but I don't believe the district court here, I think, performed an exhaustive review of the facts and applied the law appropriately. Finally, Missouri says, the Missouri Regulations Implementing Least Restrictive Environment says specifically that a child does not have to fail in their current placement before a school district, moves that child to the appropriate location to receive services. This is an add-on from the federal law, and Missouri has made it clear through its state school system codified in law that it intends to have the state schools as a place on the campus. As such a student, thank you. Your Honor, two quick points to address. First on the training of Ms. Hart, we learned for the first time at the administrative hearing that she did not have expertise in training and educating students with severe disabilities. And this was shocking to us. This question immediately springs to mind, why are you segregating this student instead of training or bringing in someone that's able to educate him? But you learned she didn't have what training or certification? She didn't have any training, and she didn't feel that she could educate JP because she didn't know how to educate students with severe disabilities. That's all in her testimony. The second issue is about the type of interactions that JP has with students that are regular education students. Dr. Blank, our expert, testified that he was at a library with JP, and another student saw JP and said, hey, I know that kid. He goes to my school. That's the type of interaction that simply would not occur if all students with severe disabilities, if JP, who is, as was pointed out, the student with the most severe disability at the district, is segregated. And that's the kind of interaction that we are hoping to protect today. Thank you, Your Honors. Thank you, counsel. The case has been thoroughly briefed and argued. We'll take it under advisement.